**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jeffrey C. STRANG and Fred Robyn Strang, a/k/a Robyn Strang, Defendants–Appellants.**

**Nos. 95–1198, 95–1922.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 6, 1996.

Decided April 10, 1996.

1216

Estaban F. Sanchez (argued), Office of U.S. Atty., Springfield, IL, for U.S. in No. 95-1198.

George F. Taseff (argued), Peoria, IL, for Fred R. Strang.

Francis C. Hulin, Estaban F. Sanchez (argued), Office of U.S. Atty., Springfield, IL, for U.S. in No. 95-1922.

Jon G. Noll, Jeffrey T. Page (argued), Springfield, IL, for Jeffrey C. Strang.

Before ESCHBACH, KANNE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In 1981 Jeffrey C. Strang and his father, Robyn Strang, set up a phony investment company, which they called Landmark Investment Corporation. Apparently juggling as fast as they could, they kept the company going until they were indicted in 1993 on various charges of mail fraud, money laundering, securities fraud, and conspiracy. Following their convictions and sentencings in 1995, they filed this appeal, raising a plethora of issues.

The Strangs' investment scheme really took off in 1986 when Jeffrey Strang began selling what he called "certificates of deposit." He represented the certificates as safe investments, but in fact they were not collateralized or insured. Some of the funds were collected from investors and converted to his and his father's use. Other funds collected from one investor were used to pay off, when necessary, another investor.

For example, in March 1989, a man named Charles Swain invested $18,000, some of which was used by Robyn Strang personally and at Wolf Run, his farm in Greene County, Illinois. In April, the funds were also used to repay investor Dan Edwards $6,500. In October 1989, Marian Bose invested $16,000, $5,954 of which was lost on futures contracts. In June 1990, Sharon Dietzler invested $17,105.28, $13,000 of which was deposited into the Wolf Run bank account. In August 1990, Gerald Eastburn invested $30,000, which was deposited into the Landmark bank account; $15,000 of this money was used to repay Dietzler for a portion of her investment. This pattern continues as to several other investors.

The most interesting transaction involved an elderly woman whom Jeffrey befriended. Alma Jasper invested $249,292.85 with Landmark. Periodically, Jeffrey paid her what he called interest. When she died on March 14, 1990, she owned Landmark certificates totaling $131,765.62. In an event apparently unrelated to the Landmark scheme, in September 1990, Jeffrey presented for payment a check drawn on her checking account in the amount of $300,000. Despite the fact that all her other checks were handwritten, this check was typed, except for her signature, and on the memo line were the words "post dated gift to Strangs." Her check register notation for the check stated "not in" in her handwriting and the amount she entered for the check in her register was $202. On this check, Jeffrey and Robyn point fingers—at

each other; each says the other endorsed the check. The bank refused to pay because Jasper's checking account was closed. Undeterred, Jeffrey filed a claim for the money against the Jasper Estate. The court disallowed the claim. Jeffrey told his father that the check was his "ace in the hole" which would get him out of trouble.

All in all, The Strangs obtained $516,213.88 from investors. The money was used as follows: approximately $100,000 to Jeffrey Strang for personal expenses; $43,000 for cash withdrawals; $29,000 for credit card purchases; $132,000 for loan payments; and $131,000 to Robyn Strang and Wolf Run.

The use of the mails was established by the mailing of an IRS form 1099 to investor Lea Ann Smith on January 24, 1991; a letter to Sharon Dietzler concerning her investments on July 8, 1992; and a February 20, 1990, certified letter that investor Eugene Wenthe mailed to Jeffrey Strang.

In August 1992, the Illinois Secretary of State Securities Division began an investigation and found that there was no registration for any securities issued by either Strang. On August 21, 1992, a temporary restraining order was issued, and on April 13, 1993, Jeffrey Strang and Landmark were permanently prohibited from selling securities except in compliance with the Illinois Securities Act.

On May 5, 1993, the Strangs were indicted, and also on that date, the court entered an ex parte restraining order prohibiting them from dissipating assets subject to forfeiture, including substitute assets. Robyn Strang obtained a release of $25,000 of the restrained funds to retain attorney Howard Feldman to represent him. An attorney named Bruce Locher was appointed as counsel for Jeffrey. Both defendants were released on a $10,000 unsecured bond.

Jeffrey Strang got into hot water while on pretrial release. On April 7, 1994, the government petitioned to revoke his bond because he had allegedly written bad checks and committed mail fraud in connection with an organization called the Children's Rights Coalition of which he was president. During the bond revocation hearing, he asked to be allowed to proceed pro se. He was allowed to do so, and on April 29 his bond was revoked and he was ordered detained.

Jeffrey was also allowed to proceed pro se during trial. However, he expressed no dissatisfaction with attorney Locher, who remained as his standby counsel. The court made clear that his representing himself would not be grounds for a continuance.

On May 2, 1995, pursuant to a written plea agreement, Robyn Strang pled guilty to three money laundering counts pursuant to 18 U.S.C. § 1957(a) and to the forfeiture count pursuant to 18 U.S.C. § 982. On January 20, 1995, he was sentenced to 42 months imprisonment plus three years supervised release. He was ordered to pay $40,156 in restitution. He also agreed, as part of the deal, to testify at his son's jury trial.

At his trial Jeffrey Strang did, in fact, represent himself despite a warning from the judge that it was a mistake. He was convicted on counts 1–16 (mail fraud pursuant to 18 U.S.C. § 1341, conspiracy pursuant to 18 U.S.C. § 371, money laundering pursuant to 18 U.S.C. §§ 1956(a)(1)(A) and 1957(a)) as well as the forfeiture count pursuant to 18 U.S.C. § 982. The securities fraud counts were dismissed on the motion of the government. On April 6, 1995, he was sentenced to 60 months on counts 1–4; 108 months on counts 5–16, all to run concurrently; 3 years supervised release, $295,586.65 in restitution, and a forfeiture. Because $202,761.28 of the forfeiture could not be located, the court ordered the forfeiture of certain substituted assets.

Robyn Strang raises three issues in his appeal: whether the district court erred in giving him a two-level increase in his base offense level for obstruction of justice for committing perjury; whether it was error to deny him a two-point adjustment for acceptance of responsibility; and whether he should have been given a downward adjustment for being either a minimal or minor participant in the conspiracy.

■ Robyn Strang contends that under § 3B1.2 of the United States Sentencing Guidelines he should have been considered a minimal or minor participant in the offense

and thus entitled to a decrease of his base offense level. The denial of the reduction is reviewed for clear error, which we do not find.

Even though his role was less than that of his son, the evidence, nevertheless, showed that he was the president of Landmark for years and had the authority to sign checks. He was aware that investors' funds were being diverted to his son's personal use. He, himself, used Wolf Run accounts to divert funds to his and his son's personal use. He secured $16,000 from a man named Henry Ruyle to obtain cattle and then used $10,000 of the money to pay off Landmark investors.

■ The other two issues raised are somewhat intertwined. Strang contends that pursuant to U.S.S.G. § 3E1.1 he was entitled to a decrease in his offense level for acceptance of responsibility. He contends that entering a guilty plea and testifying at his son's trial show that he accepted responsibility for his conduct. The government points out that a guilty plea does not automatically entitle one to the adjustment, and that furthermore his testimony was not truthful. Which leads us to the other issue: was it proper to enhance Robyn Strang's sentence under U.S.S.G. § 3C1.1 for obstruction of justice?

The enhancement was imposed based on allegedly perjurious testimony at Jeffrey Strang's trial. Specific instances of false testimony include Robyn Strang's statements that there was never any intent to defraud anyone or to scheme to defraud investors, but rather that the Strangs intended to protect investors. Robyn testified that he did not sign a $15,000 check that he later admitted signing. He testified that he did not know that two specific people had invested in Landmark when later he admitted that he knew they did. After testifying on direct examination that the government had not made any promises to him in return for his guilty plea, on cross-examination he said that he understood that a recommendation would be made that he would get "parole."

Acceptance of responsibility certainly implies a coming clean on the facts of the case or, at the minimum, avoiding falsehoods. Given Robyn's testimony at Jeffrey's trial,

which appears to be false, the district court did not abuse its discretion in declining to grant Robyn an adjustment for acceptance of responsibility. The enhancement for obstruction, however, cannot stand.

The obstruction enhancement, § 3C1.1, calls for a twolevel increase in offense level if a defendant "willfully obstructed or impeded ... the administration of justice during the ... instant offense." In *United States v. Partee*, 31 F.3d 529 (7th Cir.1994), we emphasized that "instant offense" under § 3C1.1 means the "offense conduct charged in the count of the indictment or information of which the defendant was convicted." U.S.S.G. § 1B1.2(a). See *United States v. Haddad*, 10 F.3d 1252 (7th Cir.1993); *United States v. Polland*, 994 F.2d 1262 (7th Cir. 1993); *United States v. Rubin*, 999 F.2d 194 (7th Cir.1993). Applying the definition to the guideline regarding obstruction of justice, we concluded "that a defendant cannot receive an enhancement for obstruction of justice for refusing to testify at a coconspirator's trial." *Partee* at 532–533. In arriving at that conclusion we noted with approval *United States v. Banks*, 751 F.Supp. 1161 (M.D.Pa.1990), aff'd, 931 F.2d 52 (3rd Cir.1991). In *Banks* the court declined to impose the enhancement to a defendant who testified untruthfully in the trial of a codefendant. The enhancement cannot be applied to Robyn Strang. His testimony was less than truthful, but it was given in the trial of a codefendant.

Jeffrey Strang, facing much more prison time than his father, also raises more issues: whether the forfeiture laws provide for the pretrial restraint of substituted assets; whether the evidence was sufficient to sustain the conviction; whether there were trial errors, which, individually or cumulatively, denied him a fair trial; whether it was error to give him a two-point enhancement for abuse of a position of trust; whether his court-appointed attorney was ineffective prior to trial, thereby forcing him to defend himself when he was unable to do so effectively because he was in adjustment segregation in a county jail.

Jeffrey Strang's claims regarding trial errors which individually or cumulatively denied him a fair trial are unpersuasive. Several of the issues he raises are more properly defined as sentencing issues and could have had no bearing on the trial. None of the other claims withstand scrutiny. For instance, he contends he was denied a continuance. The record, however, does not reveal that he asked for one. We reject his claims of trial errors.

Next, he claims that the evidence was insufficient to sustain his conviction. When we review a conviction for the sufficiency of the evidence, we do not reweigh the evidence nor substitute our judgment for that of the jury. *United States v. Hatchett,* 31 F.3d 1411 (7th Cir.1994); *United States v. Ross,* 77 F.3d 1525 (7th Cir.1996). We consider the evidence in the light most favorable to the government, making all reasonable inferences in its favor. We must affirm the conviction so long as a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

As to the mail fraud counts, Strang contends that there is no showing of specific intent to defraud, and that there is no evidence that he used the mails.

For a mail fraud conviction under 18 U.S.C. § 1341, the government must demonstrate that a defendant participated in a scheme to defraud, that he had an intent to defraud, and that he used the mails in furtherance of the fraudulent scheme. *United States v. Walker,* 9 F.3d 1245 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994). The record in this case abounds with evidence of a scheme to defraud and of an intent to defraud the investors. His primary contention, however, is that the evidence regarding the use of the mails is insufficient. He does not dispute that witnesses testified that they received documents through the mail. Those documents included a form 1099, a letter from an investor seeking to liquidate his investment, and correspondence regarding the status of the account of another investor. His argu-

ment is that because these documents did not induce the investors to take any specific action regarding their accounts, they fall outside the reach of the mail fraud statute. In addition, he argues that a form 1099 is a legal document and, therefore, cannot form the basis of a mail fraud conviction.

Viewing the evidence in the light most favorable to the government, we conclude that a jury could rationally find that the documents were mailed to keep the fraudulent scheme afloat. Investors would become suspicious if they were unable to obtain information regarding their accounts. To provide them with information can be seen as a way to continue the life of the scheme. See *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962).

Finally, Strang claims there was insufficient evidence of a money laundering conspiracy scheme because his father did not plead guilty to one. He also contends that because the mail fraud counts are defective, there was no illegally gathered money to launder and the money laundering counts must be dismissed. Next, because the forfeiture is based on the money laundering count, it must also be dismissed. It is, as he acknowledges, the domino theory, a theory which, in this context at least, we reject. In this case, the first domino does not fall: it is not necessary for a conspiracy conviction that all members of the conspiracy be convicted. The evidence was sufficient.

In regard to the sentencing, Jeffrey Strang contends that he should not have received an enhancement for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3; he was not a licensed securities broker and therefore he could not abuse an official position of trust. The interpretation of the term "position of trust" is a question of law, reviewed de novo. *United States v. Kosth,* 943 F.2d 798 (7th Cir.1991).

Under U.S.S.G. § 3B1.3, a defendant's sentence is enhanced two levels if he "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense...." That Jeffrey Strang was not a licensed broker does

not answer the question as to whether he was in a position of trust. It is not the category in which he fits that is controlling. See *United States v. Boyle*, 10 F.3d 485 (7th Cir.1993). Rather, it is whether he had "access or authority over valuable things." *United States v. Lamb*, 6 F.3d 415, 421 (7th Cir.1993). The sentencing court must look beyond labels to the nature of a defendant's relationship to the victims and to the responsibility he was given.

Under these criteria, Jeffrey Strang clearly abused a position of trust. Several of the investors were women he befriended; he was romantically involved with at least one of them. He befriended the elderly Mrs. Jasper. He convinced his investors of both sexes that the investments were safe and profitable. He aspired to a position of trust and then abused it. The enhancement was proper.

■ Finally, Strang contends that the pretrial forfeiture of substitute assets constituted error which, while itself may be moot, nevertheless resulted in a violation of his rights in at least two regards. First, had his assets not been frozen, he would have been able to retain counsel. Secondly, because the seizure affected the value of the assets, it prevented him from paying off his debts, which would have then meant that there was no fraud. The latter argument we reject outright.

The argument regarding representation at trial is a bit convoluted. His assets were frozen. He could not hire an attorney. Mr. Locker was appointed to represent him; however, Jeffrey Strang now says that he found the attorney to be unprepared and generally ineffective. We note that at trial, he expressed no such sentiment and, in fact, said he was happy to have Mr. Locker play the role of standby counsel. Mr. Locker also, we note, represented him during the jury instruction conference. Nevertheless, Strang now claims that because his attorney was not effective, he had to represent himself. And, he claims that his ability to represent himself was hampered: his bail was revoked and he was placed in segregation in the Peoria, Illinois, county jail where he was not able to use a law library, the telephone, video equipment, computers, or investigative services.

His argument contains a basic and fatal flaw. He never asked the court to release forfeited assets so that he could hire an attorney. His father asked for such relief and it was granted. We have no reason to think that if he had asked, Jeffrey Strang would have been denied relief. See, e.g., *United States v. Moya–Gomez*, 860 F.2d 706 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). Furthermore, counsel was appointed to represent him at trial, and Jeffrey Strang has made no showing that Mr. Locker was ineffective.

The conviction and sentence of Jeffrey Strang are AFFIRMED; Robyn Strang's sentence is vacated and his case is remanded for resentencing without an enhancement for obstruction of justice.